UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-20815-CIV-ALTONAGA/Torres

ALCIDES LANDIVAR,

    Plaintiff,
v.

CELEBRITY CRUISES, INC.,

    Defendant.
_____/

## ORDER

**THIS CAUSE** came before the Court on Defendant, Celebrity Cruises, Inc.'s Motion for Summary Judgment [ECF No. 31], filed on December 28, 2021. Plaintiff, Alcides Landivar, filed a Response [ECF No. 35], and Defendant filed a Reply [ECF No. 40]. The Court has considered the parties' written submissions (*see* [ECF Nos. 32, 36, 41]), the record, and applicable law. The Motion is now ripe for review.

### I. BACKGROUND

**A. Plaintiff's Voyage Aboard the Celebrity *Eclipse***

Plaintiff and his wife, Maria Gutierrez, booked a 14-night cruise aboard the Celebrity *Eclipse* that was scheduled to depart from Buenos Aires, Argentina, on March 1, 2020, and conclude in San Antonio, Chile, on March 15, 2020. (*See* Def.'s Statement of Material Facts [ECF No. 32] ¶ 2 [hereinafter Def.'s SMF]). In the month preceding the cruise, Plaintiff and Gutierrez received several messages from Defendant informing them about Defendant's prescreening and public health protocols. (*See id.* ¶ 3). One of the messages assured passengers that Defendant was remaining apprised of "global developments related to the coronavirus" and would take measures to minimize the risk that COVID-19 would spread on the ship. (*Id.*, Ex. C, Feb. 24, 2020 Letter

[ECF No. 32-3]). These mitigation measures included plans to deny boarding to passengers and crew who had recently traveled to or from high-risk countries or exhibited flu-like symptoms. (*See id.*).

Plaintiff and Gutierrez boarded their cruise as planned on March 1, 2020. (*See* Def.'s SMF ¶ 7). Over the next two weeks, they participated in six onshore excursions, including hours-long bus tours at several port cities. (*See id.* ¶¶ 15–16; Pl.'s Statement of Material Facts [ECF No. 36] ¶¶ 15–16 [hereinafter Pl.'s SMF]). They did not take precautions related to COVID-19 on their cruise or at the port cities they visited, other than washing their hands. (*See* Def.'s SMF ¶¶ 5, 17; Pl.'s SMF ¶¶ 5, 17).

Defendant kept an "ILI Log" to document influenza-like illness present on the cruise. (*See* Pl.'s SMF ¶ 65; *see also* Resp., Ex. A, ILI Log [ECF No. 35-1]). Between March 1 and March 9, 2020, Defendant documented eight cases of influenza-like illness among passengers and crew. (*See* ILI Log 1–2). In each case, the patient reported some combination of feverishness, a sore throat, or a cough, and was isolated after reporting symptoms to Defendant's medical staff. (*See id.* 1). At the time, operative guidance from the Centers for Disease Control and Prevention (CDC) advised that COVID-19 patients might have few or no symptoms and that symptoms "may include fever, cough, and shortness of breath." (Def.'s SMF, Ex. J, Interim Guidance for Ships on Managing Suspected Coronavirus Disease 2019 [ECF No. 32-10] 2).

No passenger or crew member was diagnosed with COVID-19 while on the cruise. (*See* Def.'s Reply to Pl.'s SMF [ECF No. 41] ¶ 70 [hereinafter Def.'s Reply SMF]). Testing was the only reliable way to diagnose COVID-19. (*See* Def.'s SMF, Ex. H, Bradberry Dep. Tr. [ECF No.

32-8] 76:14–17, 209:9–10).[1] COVID-19 tests were not widely available at the time of the cruise, and Defendant had no tests on board. (*See* Pl.'s SMF ¶ 67; Def.'s SMF ¶¶ 40–41; Def.'s Reply SMF ¶¶ 40–41; *see also* Bradberry Dep. Tr. 131:10–25). Still, Plaintiff's expert, Dr. John Bradberry, insists that Defendant should have treated any flu-like symptoms as "COVID until proven otherwise." (Bradberry Dep. Tr. 178:3–4).

On March 11, 2020, the World Health Organization (WHO) declared COVID-19 a global pandemic. (*See* Resp., Ex. C, No Sail Order and Other Measures Related to Operations [ECF No. 35-3] 2 [hereinafter No Sail Order]). Three days later, the CDC issued a "No Sail Order" advising the cruise industry of certain developments related to COVID-19 and restricting new voyages. (*See id.* 1). The No Sail Order stated, among other things, that "[t]he dynamics of passenger-to-passenger, passenger-to-crew, crew-to-passenger, and crew-to-crew intermingling in a semi-closed setting are particularly conductive to SARS-CoV-2 spread, resulting in high transmission rates." (*Id.* 3 (alteration added)). Defendant shut down its global cruise operations in March 2020. (*See* Resp., Ex. I, Campos Dep. Tr. [ECF No. 35-9] 67:24–68:12).

Three days after the No Sail Order, the captain of the *Eclipse* wrote a comment in the ship's Deck Log that read: "As a temporary measure cabin inspections are being suspended due to the rise of COVID[-]19 transmission on board[.]"[2] (Resp., Ex. B, Deck Log Book [ECF No. 35-2] (alterations added); *see also* Pl.'s SMF ¶ 68; Def.'s SMF ¶ 68). The same day, the Chilean government informed Defendant that its ports were closed to foreign cruise ship passengers. (*See*

---

[1] The Court uses the pagination generated by the electronic CM/ECF database, which appears in the headers of all court filings. Citations to deposition testimony rely on the pagination and line numbering in the original document.

[2] Defendant states it is "unknown" whether the captain of the *Eclipse* made the entry. (Def.'s SMF ¶ 68). The Court accepts Plaintiff's version of the facts on this point because it must "resolve all ambiguities and draw reasonable factual inferences from the evidence in the non-movant's favor." *Travelers Prop. Cas. Co. of Am. v. Moore*, 763 F.3d 1265, 1268 (11th Cir. 2014) (quotation marks and citation omitted).

Def.'s SMF ¶ 18). The *Eclipse* then set sail for San Diego, California. (*See id.*). Plaintiff did not disembark again until the voyage concluded in San Diego. (*See* Pl.'s SMF ¶ 64; Def.'s SMF ¶ 64).

Plaintiff is a 79-year-old male and a diabetic. (*See* Resp., Ex. F, Shipboard Medical Records [ECF No. 35-6] 1, 6; Def.'s SMF, Ex. O, Merlo Report [ECF No. 32-15] 3). On March 16, 2020, he and Gutierrez visited the *Eclipse*'s medical center to request additional insulin. (*See* Shipboard Medical Records 25). During that visit, "there were a lot of people there, sick, coughing[,]" and Gutierrez and Plaintiff "were in there in a small[,] closed space with no masks, no social distancing." (Resp., Ex. L, Gutierrez Dep. Tr. [ECF No. 35-12] 70:18–20 (alterations added)). Plaintiff returned to the medical center on March 23, 2020 to report weakness and falling out of bed that morning. (*See* Shipboard Medical Records 3). In the next week, he developed a dry cough and fever. (*See id.* 6–7).

The *Eclipse* arrived in San Diego on March 30, 2020. (*See* Def.'s SMF ¶ 18). Plaintiff disembarked and the next day tested positive for COVID-19. (*See* Pl.'s SMF ¶ 76). Plaintiff developed several "complications of COVID-19[,]" including respiratory distress and blood clots in his femoral artery, the latter leading to the amputation of his right leg above the knee. (Merlo Report 10 (alteration added)). In the days after the cruise, more than 60 passengers and crew members tested positive for COVID-19. (*See* Campos Dep. Tr. 130:5–21).

### B. Dr. John Bradberry's Testimony

Dr. Bradberry is Plaintiff's medical and liability expert. Dr. Bradberry has active medical licenses in several states and triple board certifications in emergency medicine, family medicine, and administrative medicine. (*See* Def.'s SMF, Ex. T, Bradberry Report [ECF No. 32-20] 1). He professes "extensive clinical and management experience in cruise ship medicine[,]" including

several years as a shipboard physician and as medical director for Carnival Cruise Lines. (*Id.* (alteration added)).

According to Dr. Bradberry, Plaintiff "more likely than not contracted Covid-19 while on board the Celebrity Eclipse." (*Id.* 3). Dr. Bradberry testified that Plaintiff's symptoms were severe and pointed to medical literature that suggests more severe symptoms are associated with shorter incubation periods. (*See* Bradberry Dep. Tr. 187:24–190:1). With these observations in mind, Dr. Bradberry estimated that Plaintiff became infected with the novel coronavirus on or around March 17, 2020 and that Plaintiff's incubation likely tracked the average incubation period of between five and six days. (*See id.* 53:5–21). When Defendant's counsel asked whether "any conduct on the part of Celebrity . . . caused Mr. Landivar to contract COVID[,]" Dr. Bradberry responded: "To state that it was a direct cause, I would be hard-pressed to say that. What I can say is the appropriate mitigation efforts were not implemented and what that caused was [Plaintiff] to lose opportunity for a better outcome." (*Id.* 195:7–14 (alterations added)). He also expressed doubt that Plaintiff's precise infection source "could ever be unraveled." (*Id.* 47:2; *see also id.* 49:5–7).

Dr. Bradberry faults Plaintiff's treating physicians, opining they did not provide Plaintiff with reasonable care because they failed to consider he had contracted COVID-19. (*See id.* 121:13–125:5). Yet, he simultaneously concedes that diagnosing Plaintiff with COVID-19 would "not [have] help[ed]" Plaintiff, and "[a]t that point in time there was no treatment for COVID, so . . . I really have no issue with treatment." (*Id.* 127:15–16, 131:6–9 (alterations added)).

**C. Procedural Background**

Plaintiff filed suit on February 27, 2021, asserting 21 causes of action against Defendant. (*See* Compl. [ECF No. 1]). Defendant moved to dismiss several claims for relief and to strike Plaintiff's demand for a jury trial. (*See* Mot. to Dismiss [ECF No. 18] 1–2). The Court struck

5

Plaintiff's jury trial demand and dismissed one count of the Complaint, Count XXII. (*See* July 12, 2021 Order [ECF No. 21] 14).

Later, the Court advised the parties that it would not entertain *Daubert*[3] motions or motions *in limine*. (*See* Dec. 8, 2021 Order [ECF No. 30] 2 n.2). Nevertheless, Defendant moved to strike Dr. Bradberry's testimony as untimely disclosed under Federal Rule of Civil Procedure 37. (*See* Mot. to Strike [ECF No. 33]). The Court denied the motion. (*See* January 27, 2022 Order [ECF No. 43]).

Defendant now moves for summary judgment on the Complaint's remaining counts. In his Response, Plaintiff states that he "forgoes" his claims for negligent provisioning (Count XVII) and negligent hiring or retention (Count XVIII). (Resp. 20). Plaintiff's remaining causes of action include six categories of claims: negligent failure to warn (*see* Compl. ¶¶ 43–70); negligent management of a COVID-19 outbreak aboard the ship (*see id.* ¶¶ 71–99); negligent boarding (*see id.* ¶¶ 100–23); general negligence (*see id.* ¶¶ 124–41); negligent misrepresentation (*see id.* ¶¶ 142–48); and medical malpractice (*see id.* ¶¶ 162–93).

## II. LEGAL STANDARDS

### A. Motions for Summary Judgment Under Federal Rule of Civil Procedure 56

A federal court may grant summary judgment only if the pleadings, discovery and disclosure materials on file, and any affidavits show there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a), (c). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). It is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *See id.*; *see also Matsushita Elec. Indus.*

---

[3] References to *Daubert* allude to the decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

*Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Courts must draw all reasonable inferences in favor of the party opposing summary judgment. *See Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000).

If the non-moving party bears the burden of proof at trial, the moving party may obtain summary judgment by (1) establishing the nonexistence of a genuine issue of material fact as to any essential element of a non-moving party's claim, and (2) showing the Court that there is not sufficient evidence to support the non-moving party's case. *See Blackhawk Yachting, LLC v. Tognum Am., Inc.*, No. 12-14208-Civ, 2015 WL 11176299, at *2 (S.D. Fla. June 30, 2015) (citations omitted). "Once the moving party discharges its initial burden, a non-moving party who bears the burden of proof must cite to . . . materials in the record or show that the materials cited do not establish the absence or presence of a genuine dispute." *Id*. (citing Fed. R. Civ. P. 56(c)(1); alteration added; quotation marks omitted).

"Summary judgment may be inappropriate even where the parties agree on the basic facts [] but disagree about the inferences that should be drawn from these facts." *Whelan v. Royal Caribbean Cruises Ltd.*, No. 1:12-cv-22481, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14, 2013) (alteration added; citation omitted). Indeed, "[i]f reasonable minds might differ on the inferences arising from undisputed facts, then the Court should deny summary judgment" and proceed to trial. *Id.* (alteration added; citations omitted).

**B. Governing Law**

The parties agree that federal maritime law governs Plaintiff's claims. (*See* Mot. 5–6; *see generally* Resp.). "Federal maritime law applies to actions arising from alleged torts committed aboard a ship sailing in navigable waters." *Cigainero v. Carnival Corp.*, 426 F. Supp. 3d 1299, 1304 (S.D. Fla. 2019) (citing *Keefe v. Bahama Cruise Line, Inc.*, 867 F.2d 1318, 1320 (11th Cir.

7

1989)).

## III. DISCUSSION

Defendant makes three principal arguments in support of its Motion. First, it argues that it lacked actual or constructive notice of the risk of COVID-19 transmission aboard the *Eclipse*. (*See* Mot. 6–10). Second, it argues that Plaintiff offers no credible or adequate evidence of causation. (*See id.* 10–20). Third, it contends that Plaintiff lacks sufficient expert testimony on causation to support his medical malpractice claims.[4] (*See id.* 20–22).

### A. Notice

For a duty in negligence to arise under federal maritime law, the defendant "must have had actual or constructive notice of the risk-creating condition[.]" *Amy v. Carnival Corp.*, 961 F.3d 1303, 1308 (11th Cir. 2020) (alteration added; quotation marks omitted; quoting *Keefe*, 867 F.2d at 1322). The plaintiff must show notice of a *specific* risk. *See, e.g.*, *Tonelli v. NCL (Bahamas) Ltd.*, 428 F. Supp. 3d 1313, 1319–20 (S.D. Fla. 2019). "In this circumstance, a cruise ship operator's liability 'hinges on whether it knew or should have known' about the dangerous condition." *Guevara v. NCL (Bahamas) Ltd.*, 920 F.3d 710, 720 (11th Cir. 2019) (footnote call number omitted; quoting *Keefe*, 867 F.2d at 1322).

In *Dorety v. Princess Cruise Lines Ltd.*, No. 2:20-cv-03507, 2021 WL 4913508 (C.D. Cal. Oct. 1, 2021), the court considered whether a negligence claim asserted after an outbreak of COVID-19 on a cruise ship could withstand a motion for partial summary judgment raising lack of notice. *See id.* at *1, *4–5. The question presented was whether the plaintiff had raised a genuine dispute that the cruise line "knew or should have known that the SARS-CoV-2 virus was

---

[4] Defendant does not differentiate between or argue alternatively in favor of granting summary judgment on the non-malpractice claims, Counts I through XV. (*See generally* Mot.). Thus, the Court assumes, as Defendant appears to, that the survival of one such claim implies the remaining such claims should also survive.

8

present on the [ship] at the time of the [cruise]." *Id.* at *4 (alterations added). The court answered the question in the affirmative. *See id.* at *6. In doing so, the court highlighted communications from the ship's senior doctor noting an increase in flu-like illness on the ship and evidence showing many individuals with flu-like symptoms had tested negative for the flu.[5] *See id.* at *5–6.

The court also rejected the defendant's argument that the notice element requires a person to satisfy both criteria in the CDC's then-operative guidance to qualify as a "Person Under Investigation" for COVID-19: (1) being an "epidemiological risk," meaning the person must have had close contact with a confirmed COVID-19 patient or have traveled from China within the previous 14 days; and (2) showing symptoms associated with COVID-19. *Id.* at *6; (Bradberry Dep. Tr., Ex. 8, Updated & Interim Guidance on Outbreak of COVID-19, at 322–23 [hereinafter CDC Interim Guidance]). Explaining, the court noted both the guidance and "common sense[] permit suspecting that a person has COVID-19 based on symptoms alone[.]" *Id.* (alterations added).

Similar reasoning applies here. Defendant argues that, as a matter of law, its knowledge of several passengers with flu-like symptoms did not necessarily mean that COVID-19 was present on the *Eclipse* because "fever and cough is [sic] not COVID-19[.]" (Reply 3 (alteration added)). Maybe. But, as in *Dorety*, the relevant question is whether Defendant "*should have known* that the SARS-CoV-2 virus was present on the [ship]." 2021 WL 4913508, at *4 (alteration and emphasis added). Defendant had no COVID-19 tests on the *Eclipse*, and the ILI Log does not indicate that any passengers and crew members who displayed symptoms before March 9 "tested

---

[5] Really, there were two cruises — one immediately following the other on the same ship. *See Dorety*, 2021 WL 4913508, at *2. But 62 passengers and many crew members immediately reboarded the ship after the first cruise concluded. *See id.* Although the ship's doctor conveyed concerns about an outbreak during the first cruise, those concerns were also relevant to the plaintiff, a passenger on the second cruise, since he sailed with many passengers and crew members present on the first cruise. *See id.* at *2, *6.

9

positive for the flu[.]" *Id.* at *6 (alteration added); (*see* ILI Log 1). Thus, Defendant had no way to rule out the possibility that one of these symptomatic cases was COVID-19. On this record, the question for the fact finder becomes, as Dr. Bradberry put it, whether Defendant should have treated these cases as "COVID until proven otherwise." (Bradberry Dep. Tr. 178:3–4).

Defendant disagrees. Like the defendant in *Dorety*, it insists it lacked notice that COVID-19 was present on the ship as a matter of law because none of symptomatic patients referenced by the ILI Log before March 14 met the two criteria to qualify as "Persons Under Investigation" under the CDC's extant Interim Guidance. (CDC Interim Guidance 322–23; *see* Reply 3). But the Interim Guidance was issued several days before the *Eclipse* set sail and nearly two weeks before the WHO declared COVID-19 a global pandemic, was not specifically addressed to the risk of COVID-19 transmission on cruise ships, and, in any event, noted its criteria were "subject to change as additional information becomes available." (CDC Interim Guidance 322–23). Further, Dr. Bradberry contends the Interim Guidance's criterion involving travel to China became a "moot point" after the WHO declared COVID-19 a global pandemic because that declaration necessarily implied "the virus [wa]s worldwide." (Bradberry Dep. Tr. 175:20–24 (alteration added)). Indeed, the Interim Guidance itself recognized that at least "[o]ne patient with COVID-19 who had no travel history or links to other known cases" had been reported. (CDC Interim Guidance 322 (alteration added)).

The *Dorety* court rejected the defendant's argument that it should strictly apply the Interim Guidance's criteria for "Persons Under Investigation" at summary judgment because the guidance, "as well as common sense, permit suspecting that a person has COVID-19 based on symptoms alone, irrespective of any government's definition of a 'suspected COVID-19 case.'" 2021 WL 4913508, at *6. Just so here, especially because suspecting COVID-19 based on flu-like symptoms

alone is exactly what Defendant did on the *Eclipse*: it announced that "anyone that feels unwell or demonstrates flu-like symptoms will not be permitted to sail" and isolated persons who reported flu-like symptoms after embarkation. (Feb. 24, 2020 Letter; *see* ILI Log 1–2).

What's more, evidence of Defendant's notice does not end with the ILI Log. The record is replete with precautionary measures Defendant implemented to mitigate the transmission and spread of COVID-19. As Defendant well knows, "[e]vidence that a ship owner has taken corrective action can establish notice of a dangerous condition." *Amy*, 961 F.3d at 1308 (alteration added; other alteration adopted; quoting *Carroll v. Carnival Corp.*, 955 F.3d 1260, 1265 (11th Cir. 2020)). Most explicitly, the *Eclipse* captain's March 14 entry in the Deck Log noted that crew would cease cabin inspections and expressly cited the "*rise of COVID-19 transmission on board*" as the reason for doing so.[6] (Deck Log Book (alteration and emphasis added)); *see also Dorety*, 2021 WL 4913508, at *5 (referencing evidence that the ship's senior doctor communicated "an increase in the number of crew and guest influenza-like illness cases" (alteration adopted; quotation marks omitted)).

Further examples abound. For instance, despite Defendant's argument that "fever and cough is [sic] not COVID-19" (Reply 3), *Defendant's own pre-boarding protocols* called for excluding any passengers or crew members with flu-like symptoms as presumptive COVID-19 cases. (*See* Feb. 24, 2020 Letter). The ILI Log also indicates that each passenger or crew member who reported flu-like symptoms in early March was isolated after doing so. (*See* ILI Log 1). With

---

[6] Defendant's attempt to explain away the Deck Log entry as a "general COVID-19 prophylactic measure" not taken "in response to a specific risk" of COVID-19 on the *Eclipse* is facile (Reply 6), as it ignores both the language of the entry itself and the legal standard governing motions for summary judgment. *See, e.g.*, *Amy*, 961 F.3d at 1309 ("[S]uffice it to say that the district court's focus on specificity here was too exacting for this notice issue at summary judgment." (alteration added; citation and footnote call number omitted)); *see also Travelers Prop. Cas. Co.*, 763 F.3d at 1268.

these facts in the record, a reasonable factfinder could conclude that Defendant should have been aware of a specific risk that COVID-19 was present on the *Eclipse*.

To summarize, the record is laden with evidence that presents a genuine dispute about whether Defendant had notice of COVID-19 aboard the *Eclipse*, so summary judgment on that basis must be denied.

### B. Causation

Defendant next seeks summary judgment on causation. It attacks Dr. Bradberry's qualifications, argues that his testimony on causation is "speculation unsupported by scientific methodology or evidence[,]" and asserts that he failed to consider infection sources beyond the ship. (Mot. 10–12 (alteration added)).

These arguments fail to persuade at summary judgment. At bottom, Defendant asks the Court to simply disregard Dr. Bradberry's testimony — the functional equivalent of a *Daubert* motion. As stated, the Court previously indicated it would not consider *Daubert* motions. This is because, as the Eleventh Circuit has repeatedly recognized, the "barriers" to admitting expert testimony erected by *Daubert* "are . . . relaxed in a bench trial situation, where the judge is serving as factfinder[.]" *United States v. Brown*, 415 F.3d 1257, 1268 (11th Cir. 2005) (quotation marks and citation omitted; alterations added). A district court typically functions as the "gatekeeper" between a jury and evidence of questionable admissibility. *Id.* at 1266. But when the district court assumes the role of factfinder, its gatekeeping duties become less important. "There is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for h[er]self." *Id.* at 1269 (alteration added).

This is why "district courts conducting bench trials have substantial flexibility in admitting proffered expert testimony at the front end, and then deciding for themselves during the course of

trial whether the evidence meets the requirements of [Federal Rule of Evidence] 702." *City of South Miami v. DeSantis*, No. 19-22927, 2020 WL 7074644, at *6 (S.D. Fla. Dec. 3, 2020) (alteration added; quotation marks and citation omitted). In a bench trial, a district court may allow expert testimony of questionable admissibility and then give it appropriate weight. *See id.*; *see also Brown*, 415 F.3d at 1270 (affirming district court's admission of testimony of defendant's expert because "the court-as-gatekeeper let the court-as-factfinder consider [the] testimony, but the court-as-factfinder decided not to give it much weight" (alteration added)).

By asking the Court to ignore Dr. Bradberry's testimony, Defendant seeks through the procedural device of summary judgment relief it knew it could not obtain through a *Daubert* motion. Instead of arguing that Dr. Bradberry's testimony on causation is *inadmissible*, Defendant argues his testimony is *not credible*. Yet, credibility has no role to play at summary judgment.

The argument is also premature. "The same rationale for applying *Daubert* less stringently in a bench trial applies to considering expert testimony at summary judgment." *Pledger v. Reliance Tr. Co.*, No. 1:15-cv-4444, 2019 WL 4439606, at *4 (N.D. Ga. Feb. 25, 2019) (citation omitted). That is because, at summary judgment, "[a] court may not weigh conflicting evidence or make credibility determinations of its own." *Buending v. Town of Redington Beach*, 10 F.4th 1125, 1130 (11th Cir. 2021) (alteration added; other alteration adopted; quotation marks omitted; quoting *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012)). "Questions about the weight given to testimony . . . are for the factfinder." *Brown*, 415 F.3d at 1270 (alteration added).

Deferring evidentiary rulings until trial hardly leaves Defendant defenseless. The Eleventh Circuit has emphasized that "*Daubert* 'is not intended to supplant the adversary system or the role of the [factfinder].'" *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th

13

Cir. 2003) (alteration added; quoting *Maiz v. Virani*, 253 F.3d 641, 666 (11th Cir. 2001)). Rather, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* (alteration adopted; quoting *Daubert*, 509 U.S. at 596). Defendant remains free to cross-examine Dr. Bradberry at trial and may make the points it stresses in its Motion at that time.

Finally, Defendant points out Dr. Bradberry's statements that he felt "hard-pressed" to say Defendant's actions were "a direct cause" — and that he cannot identify the precise source — of Plaintiff's COVID-19 infection. (Mot. 18 (citation omitted)). Doubtlessly, though, Defendant would also have objected to testimony that its failure to mitigate the spread of COVID-19 was the "direct cause" of Plaintiff's infection as an impermissible legal conclusion. *See Webb v. Carnival Corp.*, 321 F.R.D. 420, 426 (S.D. Fla. 2017) (striking expert testimony that cruise line's breach of duty of care "was the direct cause" of decedent being overserved alcohol); *see also Umana-Fowler v. NCL (Bahamas) Ltd.*, 49 F. Supp. 3d 1120, 1122 (S.D. Fla. 2014) ("An expert witness may testify as to his opinion on an ultimate issue of fact, but he 'may not testify as to his opinion regarding ultimate legal conclusions.'" (quoting *United States v. Delatorre*, 308 F. App'x 380, 383 (11th Cir. 2009))).

Semantics aside, Dr. Bradberry's testimony is consistent with other record evidence and would permit a reasonable factfinder to infer causation. Dr. Bradberry testified that Plaintiff contracted COVID-19 around March 17, 2020. (*See* Bradberry Dep. Tr. 53:5–21). Gutierrez testified that she and Plaintiff visited the ship's medical center on March 16 in what appeared to be a high-risk setting: there were many people in the small waiting area, no one was wearing a mask or social distancing, and people were sick and coughing. (*See* Gutierrez Dep. Tr. 70:18–20).

Defendant might not believe this version of the facts, but believability is an issue for the Court sitting as factfinder to determine at trial.

Summary judgment is denied as to Counts I through XV.

### C. Medical Malpractice

Defendant argues that Plaintiff lacks adequate expert testimony to support its medical malpractice claims in Counts XIX through XXI. The Court agrees.

Succeeding on a medical malpractice claim under federal maritime law requires establishing that: (1) the defendant had a duty to protect the plaintiff from a specific injury; (2) defendant breached that duty; (3) the breach was the actual and proximate cause of the plaintiff's injury; and (4) the plaintiff suffered damages. *See Law v. Carnival Corp.*, No. 20-21105-Civ, 2021 WL 3129631, at *2 (S.D. Fla. July 23, 2021) (citing *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1336 (11th Cir. 2012)). To establish proximate cause, a plaintiff must show the defendant's breach was "a substantial factor in bringing about the harm" to the plaintiff. *In re Royal Caribbean Cruises Ltd.*, 991 F. Supp. 2d 1171, 1183 (S.D. Fla. 2013) (quotation marks omitted; quoting *Chavez v. Noble Drilling Corp.*, 567 F.2d 287, 289 (5th Cir. 1978)).

Only expert testimony can support a finding of medical causation if the causal connection between the breach and the harm is "not readily observable or susceptible to evaluation by lay persons." *Mann v. Carnival Corp.*, 385 F. Supp. 3d 1278, 1285 (S.D. Fla. 2019) (citing *Rivera v. Royal Caribbean Cruises Ltd.*, 711 F. App'x 952, 954 (11th Cir. 2017)). Whether the performance of the physicians who treated Plaintiff aboard the *Eclipse* caused Plaintiff's subsequent medical complications is a question not amenable to be answered by laypersons. Dr. Bradberry is Plaintiff's only medical expert. Thus, only Dr. Bradberry can establish medical causation.

At his deposition, Dr. Bradberry insisted that Plaintiff's treating physicians did not meet their duty of care to Plaintiff because they failed to consider a COVID-19 diagnosis. (*See* Bradberry Dep. Tr. 121:13–125:5). But when asked what the physicians could have done for Plaintiff if they had correctly diagnosed him, Dr. Bradberry answered: "At that point in time there was no treatment for COVID, so all they could do is — at that point is provide supportive care so I really have no issue with the treatment." (*Id.* 131:2–9). Also, although Dr. Bradberry criticized Defendant's doctors for not recognizing a COVID-19 outbreak earlier and failing to recommend mitigating measures, he admitted "[a]t th[at] point it's not going to help Mr. Landivar." (*Id.* 127:15–16 (alterations added)).

This testimony falls short of establishing proximate cause. Even assuming the failure to diagnose Plaintiff with COVID-19 amounted to a breach of duty, Dr. Bradberry confirmed that correctly diagnosing Plaintiff would not have enabled the physicians to provide him with better treatment. Put differently, the record indicates that Plaintiff's injuries resulted from his *contracting* COVID-19 — not from his physicians' *failure to diagnose* him with COVID-19. Given the lack of treatment options available to COVID-19 patients at the time, the *Eclipse* doctors' failure to consider the correct diagnosis could not have been a "substantial factor" in causing Plaintiff's injuries. *Royal Caribbean Cruises Ltd.*, 991 F. Supp. 2d at 1183 (citation omitted).

Plaintiff barely contests this point. He instead cites various portions of Dr. Bradberry's testimony without explanation. (*See* Resp. 20). In some of that testimony, Dr. Bradberry faulted doctors on the *Eclipse* for not having recognized *other patients'* cases of COVID-19 sooner and pins that omission as the cause of Plaintiff's poor outcome. (*See, e.g.*, Bradberry Dep. Tr. 127:9–16). But this novel theory of medical malpractice is not the one Plaintiff pleaded. (*See, e.g.*, Compl. ¶¶ 170–71 (alleging that doctors breached duty by, among other things, "[f]ailing to

promptly treat *Plaintiff* with the appropriate medications" and absent that alleged breach, "*Plaintiff's* medical condition would have been better managed" (alteration and emphases added))).

Accordingly, Defendant is entitled to partial summary judgment on the proximate cause element of Plaintiff's medical malpractice claims.

## IV. CONCLUSION

In accordance with the foregoing, it is **ORDERED AND ADJUDGED** that Defendant, Celebrity Cruises, Inc.'s Motion for Summary Judgment **[ECF No. 31]** is **GRANTED in part** and **DENIED in part** as follows:

1. The Motion is **DENIED** with respect to Counts I through XV.

2. Counts XVII and XVIII are **DISMISSED**.

3. Partial summary judgment is **GRANTED** in favor of Defendant with respect to Counts XIX, XX, and XXI.

**DONE AND ORDERED** in Miami, Florida, this 8th day of February, 2022.

_____
**CECILIA M. ALTONAGA**
**CHIEF UNITED STATES DISTRICT JUDGE**

cc: counsel of record